IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CR. NO.: 3:20-335 |
| v. | 18 U.S.C. § 371<br>18 U.S.C. § 1341<br>18 U.S.C. § 1343 |
| STEPHEN ANDREW BYRNE | 18 U.S.C. § 981(a)(1)(C)<br>18 U.S.C. § 982(a)(1)<br>18 U.S.C. § 982(a)(2)<br>28 U.S.C. § 2461 |
| | INFORMATION |

THE UNITED STATES ATTORNEY CHARGES:

At all times relevant to this Information:

1. The defendant, STEPHEN ANDREW BYRNE, along with others known and unknown to the United States Attorney, consisting of former SCANA Corporation ("SCANA") executives, employees, and the lawyers who advised them, led a failed effort to construct two nuclear power generators in Fairfield County, South Carolina. As construction problems mounted, costs rose, and schedules slipped, the defendant, STEPHEN ANDREW BYRNE, and others, hid the true state of the project. Through intentional and material misrepresentations and omissions, the defendant, STEPHEN ANDREW BYRNE, deceived regulators and customers in order to maintain financing for the project and to financially benefit SCANA. The members of the conspiracy's actions and the associated cover-up allowed the project to continue until the contractor went bankrupt and the project was abandoned, resulting in billions of dollars of loss.

Background

2. SCANA was a publicly-traded holding company engaged, through subsidiaries, in electric and natural gas utility operations and other energy-related businesses. SCANA was incorporated in South Carolina and maintained its principal executive offices at 220 Operation Way, Cayce, South Carolina 29033-3701.

3. SCANA's principal subsidiary, South Carolina Electric and Gas Company ("SCE&G"), was a regulated public utility engaged in the generation, transmission, distribution and sale of electricity, primarily in South Carolina. SCE&G, a monopoly, had approximately 700,000 electricity customers and 350,000 natural gas customers in South Carolina (hereinafter, SCANA and SCE&G will be referred to collectively as "SCANA").

4. The Public Service Commission ("PSC") was the state regulatory authority vested with the power and jurisdiction to set rates for public utilities in South Carolina. Composed of seven members elected by the General Assembly, the PSC retained the ultimate authority to approve or deny the rates SCANA charged its customers, and to adjudicate all related rate disputes.

5. The Office of Regulatory Staff ("ORS") was a state agency responsible for inspecting, auditing, and examining public utilities. The ORS had a dual function: (1) it represented South Carolina's public interest in utility regulation before the PSC, the court system, the South Carolina General Assembly, and federal regulatory bodies; and (2) it advanced the utilities' interests. In fulfilling these dual roles, ORS performed the investigative, legal, prosecutorial, and educational roles of utility regulation, while at the same time acting as an advocate for the utilities.

6. As a regulated monopoly subject to the exclusive rate-setting regulatory authority of the PSC, SCANA was required to truthfully report the costs, schedule, and status of the project to the ORS and the PSC.

7. The defendant, STEPHEN ANDREW BYRNE, was SCANA's Executive Vice President and the Chief Operating Officer ("COO").

8. The South Carolina Public Service Authority ("Santee Cooper") was a state-owned utility that provided power and water to citizens of the South Carolina Lowcountry and to approximately twenty cooperative power companies. SCANA and Santee Cooper (together "the Owners") were majority and minority partners, respectively, in the V.C. Summer new nuclear development.

9. Westinghouse Electric Company ("Westinghouse") was a Pennsylvania-based company that was traditionally an engineering firm. Westinghouse designed the AP-1000, a next-generation, modular-based nuclear power plant.

10. The Consortium was the group of companies operating under an Engineering, Procurement, and Construction ("EPC") contract with the Owners. It included Westinghouse and various construction companies hired by Westinghouse to construct AP-1000 units, to include Shaw Group ("Shaw") and Chicago Bridge and Iron ("CB&I").

11. Westinghouse purchased CB&I's nuclear subsidiary, Stone & Webster, at the end of 2015. Stone & Webster was thereafter known as WECTEC.

12. Fluor Corp. ("Fluor") was an engineering, procurement, construction, and project management company headquartered in Irving, Texas.

13. The Bechtel Corporation ("Bechtel") was an engineering, procurement, construction, and project management company headquartered in Reston, Virginia.

## The Nuclear Project

14. In May 2008, SCANA and Santee Cooper agreed to construct two AP-1000 nuclear reactors ("the Nuclear Project") at the V.C. Summer site in Jenkinsville, South Carolina.

15. Under the agreement, SCANA held the majority ownership interest of 55%, while Santee Cooper held the remaining 45% ownership interest. SCANA and Santee Cooper's arrangement allowed SCANA to effectively control the daily operations and management of the Nuclear Project.

16. SCANA did not have the capital to directly finance the cost of the Nuclear Project, initially estimated at $9.8 billion. Instead, SCANA obtained financing for the project through rates paid by its customers, as provided under the Base Load Review Act ("BLRA"), S.C. Code Ann. §§ 58-33-210, et seq.

17. In addition, the Energy Policy Act of 2005 ("Energy Policy Act"), 42 U.S.C. § 15801, et seq., provided SCANA with tax incentives to make the construction of the two new nuclear facilities financially viable. If the V.C. Summer new nuclear units were producing power by January 1, 2021, SCANA would qualify for tax credits worth approximately $1.4 billion.

18. The BLRA provided SCANA with additional financial incentives to build the Nuclear Project. Passed by the South Carolina General Assembly in 2007, the BLRA permitted utility companies to petition the PSC to raise utility rates to cover the construction financing costs during the project rather than wait for project completion to raise rates. However, to raise rates to cover the construction financing costs under the BLRA, SCANA was required to demonstrate that the decision to incur preconstruction costs was "prudent." S.C. Code Ann. §§ 58-33-210 et seq. SCANA was required to truthfully report the construction schedule and the capital costs to justify the proposed rate increases.

19. In May 2008, SCANA and Santee Cooper signed the EPC contract with the Consortium, which established Westinghouse as the lead contractor for the Nuclear Project. Westinghouse initially selected Shaw, later CB&I, as supporting contractor.

20. On May 30, 2008, SCANA submitted its first application to the PSC under the BLRA requesting rate increases to cover the construction financing costs of the Nuclear Project. In February 2009, the PSC approved SCANA's petition. In July 2009, SCANA submitted a revised construction schedule to the PSC, which the PSC approved in January 2010. During the course of the approval process, SCANA executives vowed to be transparent in the updates they provided to the PSC.

21. In March 2012, the United States Nuclear Regulatory Commission ("NRC") approved SCANA and Santee Cooper's request to commence the Nuclear Project. Construction began in March 2013. In its initial BLRA filing with the PSC, SCANA projected that Unit 2 would be generating power by April 2016, and that Unit 3 would be generating power by January 2019.

22. From its inception, the Nuclear Project was plagued by schedule delays and cost increases. By September 2013, emails between SCANA and the Consortium stated that Westinghouse's "missed deadlines put potentially unrecoverable stress on the milestone schedule" approved by the PSC. Within six months, by May 2014, SCANA and Santee Cooper executives sent a letter to Westinghouse executives outlining their complaints and criticizing the Consortium for poor performance and recurring design and schedule delays. According to SCANA and Santee Cooper executives, the Consortium had "made promise after promise, but fulfilled few of them."

23. In October 2015, SCANA and Santee Cooper signed an amendment to the EPC with Westinghouse. Westinghouse obtained CB&I's nuclear subsidiary and agreed to bring in Fluor as the subcontractor on the Nuclear Project.

24. At various times, SCANA provided the PSC different substantial completion dates for the units. The following schedule shows each event, followed by the nuclear reactor number and the date of completion submitted to the PSC for that reactor:

| | | | | |
|---|---|---|---|---|
| Order 2009-104(A) | Unit 2 | April 1, 2016 | Unit 3 | January 1, 2019 |
| Order 2012-884 | Unit 2 | March 15, 2017 | Unit 3 | May 5, 2018 |
| Docket 2015-103-E | Unit 2 | June 19, 2019 | Unit 3 | June 16, 2020 |
| Docket 2016-223-E | Unit 2 | August 31, 2019 | Unit 3 | August 31, 2020 |

25. The construction complete percentages provided to SCANA by the Consortium showed that the Nuclear Project was woefully behind schedule, averaging less than 0.6 percent complete per month for over four years.

26. From its first petition in 2009 and throughout the construction of the Nuclear Project, SCANA documents show that it paid over $2.5 billion in dividends to its investors, more than $520 million of which came directly from SCANA customers through rate increases under the BLRA. Despite the Nuclear Project's failure, SCANA executives received millions of dollars in compensation. From 2015 to 2017, SCANA paid the defendant, STEPHEN ANDREW BYRNE, approximately $6.3 million in compensation bonuses and salary, PERSON A approximately $7 million in compensation bonuses and salary, and PERSON B approximately $15 million in compensation bonuses and salary.

<u>The Scheme to Defraud Customers</u>

27. From a time beginning in June 2016, and continuing until January 1, 2018, the defendant, STEPHEN ANDREW BYRNE, joined others, through SCANA, to engage in a scheme, plan, and artifice to defraud customers, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, by making false and misleading statements, and omitting facts necessary to make the statements truthful and not misleading.

28. The defendant, STEPHEN ANDREW BYRNE, and others, through SCANA, made materially false and misleading statements in an effort to continue the Nuclear Project by minimizing regulatory risk and avoiding state government oversight. Among other things, the defendant, STEPHEN ANDREW BYRNE, and others, made false and misleading statements to

the PSC, the ORS, the South Carolina State Government, the media, and to SCANA's customers. In addition, the defendant, STEPHEN ANDREW BYRNE, and others, withheld derogatory information from these entities regarding the status of the project and evaluation of the management. To further the scheme, members of the conspiracy:

    a. Represented to regulatory agencies that V.C. Summer Unit 2 would be operational in 2019 and would qualify for the PTCs; when in truth members of the conspiracy knew that the schedule was unrealistic and that Unit 2 would not likely be completed in 2019.

    b. Represented to regulatory agencies that V.C. Summer Unit 3 would be operational in 2020 and would qualify for the PTCs; when in truth members of the conspiracy knew that the schedule was unrealistic and that Unit 3 would not likely be completed in 2020.

    c. Represented to regulatory agencies that V.C. Summer Units 2 and 3 would be operational in 2019 and 2020, when in truth members of the conspiracy had hired Bechtel to evaluate the project; Bechtel found the Nuclear Project to be significantly off-schedule and over-budget. Members of the conspiracy never provided this information to the regulatory agencies.

    d. Represented to regulatory agencies costs of the project that were significantly and materially lower than what was expected.

    e. Applied for and received rate increases based upon misrepresentations and misleading statements that lead to fraudulently inflated bills to customers for the stated purpose of financing the project.

    f. Sent the above-referenced bills to customers, both electronically and in the mail.

g. Received payments from customers of inflated rates, both electronically and in the mail.

h. Provided customers misleading information regarding the progress of the construction of V.C. Summer Units 2 and 3.

i. Paid over $500 million of the $2.2 billion dollars customers paid to finance the construction project directly to shareholders in dividends.

j. Provided misleading information to state government officials regarding the progress of the Nuclear Project.

k. Commissioned Bechtel to conduct a comprehensive review of the status of the Nuclear Project in 2015, and when Bechtel provided data demonstrating that the Nuclear Project was failing catastrophically, bifurcated, edited, and buried the Bechtel report(s) and the information contained within under disingenuous representations of attorney-client privilege. The Bechtel conclusions were not made public until after abandonment of the Nuclear Project.

## COUNT ONE

29. From a time beginning in June 2016, and continuing until January 1, 2018, in the District of South Carolina and elsewhere, the defendant, STEPHEN ANDREW BYRNE, and others, through SCANA, knowingly and intentionally combined, conspired, confederated, agreed, and had a tacit understanding to:

a. knowingly devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and in furtherance of this scheme, did use and cause to be used the United States

mail and common carriers, in violation of Title 18, United States Code, Section 1341; and

b. knowingly devised a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, transmitted or caused to be transmitted by means of wire, radio, or television communication in interstate commerce, any writings, signs, signals, pictures or sounds for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## The Object of the Conspiracy

30. The object of the conspiracy was for the defendant, STEPHEN ANDREW BYRNE, and others, through SCANA, to provide false representations and omit necessary facts in disclosures to the PSC, the ORS, the South Carolina State Government, the media, and to SCANA's customers, so that the construction of the Nuclear Project would continue, minimizing regulatory risk, and avoiding state government oversight, all to defraud customers through inflated bills.

## Overt Acts

30. In furtherance of the conspiracy, the defendant, STEPHEN ANDREW BYRNE, and others known and unknown to the United States Attorney, committed the following overt acts in the District of South Carolina:

a. On or about July 1, 2016, the defendant, STEPHEN ANDREW BYRNE, submitted written testimony as follows: "SCE&G's construction experts have reviewed this schedule and found that its scope and sequencing is logical and appropriate...Consistent with its responsibility as owner, SCE&G has carefully

      reviewed and evaluated all information that is available related to the project and schedule and finds it to be reasonable. It is my opinion that WEC and Fluor have a reasonable construction plan in place to achieve the GSCD . . . [A]ll these factors support the conclusion that the construction schedule . . . is a reasonable and prudent schedule for completing the units . . . [I]t is my considered opinion that [the construction schedule] represents a reasonable and prudent schedule for completing the project as envisioned by the BLRA," and that the costs for the Nuclear Project 'are prudent in every respect,'" which misrepresented the truth.

b. On or about July 1, 2016, PERSON A submitted written testimony as follows: "[T]he current schedules reflect the best information that is available about the anticipated costs and construction timetables for completing the project . . . as Mr. Byrne testifies, they are based on a careful review of the construction plans . . . [and] tasks required to complete them," which misrepresented the truth.

c. On or about July 1, 2016, PERSON B submitted written testimony as follows: "The federal tax credits that are available to the project are worth a total of $1.2 billion to customers. Both of our plants must produce power before the end of 2020 to qualify for the full amount of these credits. The GSCD for Unit 2 is now 16 months ahead of that deadline and the GSCD for Unit 3 is four months ahead of it…I can affirmatively testify, as I have testified in prior proceedings, that SCE&G is performing its role as project owner in a reasonable, prudent, and cost-effective manner," which misrepresented the truth.

All in violation of Title 18, United States Code, Section 371.

# FORFEITURE

SPECIFIED UNLAWFUL ACTIVITIES:

Upon conviction of violating Title 18, United States Code, Section 371, as charged in the Information, the defendant, STEPHEN ANDREW BYRNE, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(2) and 982(a)(1) and Title 28, United States Code, Section 2461(c), any property, real or personal, which is involved in such violation or which constitutes or is derived from proceeds traceable to such property.

The property subject to forfeiture includes, but is not limited to, the following:

(1)   Proceeds/Money Judgment:

    (a)   A sum of money equal to all proceeds the defendant, STEPHEN ANDREW BYRNE, obtained, directly or indirectly, from the offenses charged in Count 1 of the Information, that is, an amount to be determined by the Court at sentencing in United States currency, and all interest and proceeds traceable thereto, and/or that such sum equals all property involved in or traceable to the violations of 18 U.S.C. §§ 371, 1341, 1343.

    (b)   A sum of money equal to all property involved in the money laundering offenses charged in the Information, and all proceeds traceable thereto.

If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant, STEPHEN ANDREW BYRNE -

(1)   Cannot be located upon the exercise of due diligence;

(2)   Has been transferred or sold to, or deposited with, a third person;

(3)   Has been placed beyond the jurisdiction of the court;

(4)   Has been substantially diminished in value; or

(5) Has been commingled with other property which cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b)(1), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant, STEPHEN ANDREW BYRNE, up to the value of the forfeitable property;

Pursuant to Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1) and (a)(2), and Title 28, United States Code, Section 2461(c).

_____
PETER M. MCCOY, JR.
UNITED STATES ATTORNEY

(JHM, BBA, EEL, WDHjr)