UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 3:20-CR-335 |
| v. | |
| STEPHEN ANDREW BYRNE | |

### DEFENDANT STEPHEN BYRNE'S MOTION FOR DOWNWARD VARIANCE AND DEPARTURE AND MEMORANDUM IN SUPPORT THEREOF

Defendant Stephen A. Byrne ("Mr. Byrne"), by and through his undersigned counsel, hereby moves the Court for a variance from the Guidelines range and a downward departure to afford him a reasonable sentence pursuant to 18 U.S.C. § 3553.

For the reasons set forth herein, Mr. Byrne respectfully requests that this Court sentence him to a term of imprisonment of no more than fifteen (15) months. The United States does not oppose this request. In July 2020, Mr. Byrne pled guilty to a single count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371. That offense carries a statutory maximum of five years imprisonment, a fine of up to $250,000, supervised release of up to three years, and a special assessment of $100.00. Mr. Byrne and the United States also have stipulated that he will forfeit $1,000,000. A sentence of fifteen months imprisonment constitutes a "just punishment" and is a "sufficient but not greater than necessary" sentence in light of Mr. Byrne's background, lack of prior convictions, acceptance of responsibility, and the substantial and ongoing cooperation he has and will continue to provide to federal and state authorities.

Over the last three-and-one-half years, Mr. Byrne has provided substantial assistance to the United States Government in connection with its lengthy and complex investigation concerning SCANA and Santee Cooper's joint project to build two nuclear reactors at the V.C. Summer

Nuclear Station ("V.C. Summer") in Jenkinsville, South Carolina (the "Nuclear Project"). As detailed in this submission, Mr. Byrne's extensive cooperation has assisted multiple federal and state agencies and investigations, including the United States Attorney's Office for the District of South Carolina, the Federal Bureau of Investigation ("FBI"), the U.S. Securities & Exchange Commission ("SEC"), the South Carolina Attorney General's Office, and the South Carolina Law Enforcement Division ("SLED"). Mr. Byrne was the first individual to come forward and accept responsibility for his conduct, and his cooperation has been instrumental in helping the United States and other law enforcement agencies understand the relevant events at the Nuclear Project, the roles and relevant conduct of executives and attorneys at SCANA and Santee Cooper, the roles and relevant conduct of executives and employees of Westinghouse, CB&I and the Flour Corporation, and information establishing the culpability of other individuals. In short, Mr. Byrne's cooperation has been indispensable in helping authorities understand the full story of what happened at V.C. Summer and what led to the decision to abandon the Nuclear Project in July 2017.

Mr. Byrne's cooperation also has been extremely impactful for the United States. To date, it has led to a plea of guilty to conspiracy to commit mail fraud and wire fraud by former SCANA CEO Kevin Marsh; a plea of guilty to making a false statement in violation of 18 U.S.C. § 1001 by former Westinghouse executive Carl Churchman; a sixteen-count indictment against former Westinghouse Executive Vice President Jeffrey Benjamin; and a cooperation agreement between Westinghouse and the United States Attorney's Office pursuant to which Westinghouse agreed to pay $21.25 million and cooperate in the United States' investigation, among other resolutions.

This submission contains detailed information about the significant cooperation provided by Mr. Byrne to date, as well as background and other factual information concerning Mr. Byrne

and the Nuclear Project that is relevant to the Court's imposition of sentence in this case and to the Court's analysis under *United States v. Booker*, 543 U.S. 220 (2005), and 18 U.S.C. § 3553(a). Specifically, this memorandum explains that a downward variance to a sentence of fifteen months is warranted based on Mr. Byrne's history and characteristics and the nature and circumstances of the offense. That sentence would also honor the sentencing goals of 18 U.S.C. § 3553(a)(2) by promoting respect for the law and providing a just punishment for the offense, as well as affording adequate deterrence to criminal conduct. And the downward departure is consistent with the need to avoid unwarranted sentencing disparities among similarly situated defendants and to provide restitution to any victims of the offense. The submission closes by addressing Mr. Byrne's cooperation with the United States and the collateral consequences he would face absent a downward variance.

Character letters submitted in support of Mr. Byrne are attached as Exhibit A. Mr. Byrne respectfully requests that the Court consider this information when imposing sentence upon Mr. Byrne in this matter.

## I.    MR. BYRNE'S BACKGROUND

### A.    Personal History

Mr. Byrne was born in December 1959 in West Hartlepool, England. He is the oldest of three sons born to Francis and Marie Byrne. His father was an electrical engineer and his mother a nurse. When Mr. Byrne was five years old, his family moved from England to the United States, living briefly near Buffalo, New York before settling in the Detroit, Michigan area, where he met his future wife, Julie Byrne during high school. Mr. and Mrs. Byrne have been married for 37 years.[1] Mrs. Byrne is a retired nurse, property manager, and artist, having graduated with a nursing

---

[1] Mr. Byrne and his wife previously separated and are working to reconcile.

degree from Northwestern Michigan College. The Byrnes have two children, Ryan and Jennifer. Ryan, age 33, is a Wofford College graduate who served in the United States Army as a Green Beret for seven years after college. While in the Army, Ryan was deployed to Iraq where he counteracted ISIS/ISIL terrorist operations. Jennifer, age 35, was a high school SAT team state champion, graduated from the University of Chicago in three years, and is a software engineer for Software on Vinyl, where she writes code for apps and websites.

As noted in the character letters that are attached, Mr. Byrne has worked extremely hard his entire life. At age 12, he took a job as a paperboy for the Detroit Free Press newspaper. For two years, Mr. Byrne was up at 4 a.m. seven days a week bundling and delivering newspapers. This work helped fund and fulfill his goal of traveling to England to visit his family and tour the United Kingdom.

Mr. Byrne graduated from Harry S. Truman High School in Michigan in 1978 and became a naturalized United States citizen in 1979. Mr. Byrne graduated in the top 10 of his high school class of more than 600 students. Mr. Byrne was a merit scholar and a member of the National Honor Society, in addition to working multiple jobs, including at a Hardee's restaurant, a pizza restaurant, a car repair facility, for the City of Taylor Recreation Department during the summer, and for a menswear retailer called Richmond Brothers during Christmas seasons. In addition to his academic success in high school, Mr. Byrne was a three-sport athlete (football, track, and cross country).

Mr. Byrne attended college at Wayne State University on an academic scholarship and earned a Bachelor of Science degree in chemical engineering in 1983. While in college, Mr. Byrne was the starting goalie on the soccer team and was a member of the American Institute of Chemical Engineers. He also worked at a local K-mart, a local drug store, and coached and refereed youth

soccer, which helped to pay for college expenses that were not covered by his scholarship.  Mr. Byrne worked his last two summers in college for the Army Corps of Engineers as a summer engineering intern in the Detroit District, River Flows Division.

In January 1984, following his graduation from college, Mr. Byrne moved to the Toledo, Ohio area and took an engineering job with the power company Toledo Edison (which later became Centerior Energy) at the Davis-Besse Nuclear Power Station.  Mr. Byrne worked for Centerior Energy for more than eleven years.  He started in Operations/Chemistry/Maintenance, and as a result of his hard work, he was promoted several times to several positions with increasing supervisory responsibilities.  In 1987, while working for Centerior Energy, Mr. Byrne earned his Federal Senior Reactor Operator License from the Nuclear Regulatory Commission ("NRC"). Obtaining an NRC license requires extensive training, and applicants must pass a series of rigorous examinations.  In June 1993, he was promoted to the position of Operations Manager of the Davis-Besse Nuclear Power Station.

### B.    Employment by SCANA

In June 1995, Mr. Byrne moved to South Carolina to accept a position at SCANA Corporation and its subsidiary, South Carolina Electric & Gas Company ("SCE&G"), as Plant Manager of the V.C. Summer Nuclear Station (Unit 1).  During the course of his twenty-three years of service at SCANA, Mr. Byrne was promoted repeatedly and held several positions with increasing leadership and managerial responsibilities, including Site Vice President and Chief Nuclear Officer of the V.C. Summer Nuclear Station (Feb. 2000 – Jan. 2004); Senior Vice President – Generation and Chief Nuclear Officer (Jan. 2004 – Sept. 2009); and Executive Vice President – Generation (Sept. 2009 – Jan. 2011).

In January 2011, Mr. Byrne was promoted to the position of President – Generation & Transmission and Chief Operating Officer ("COO") for SCE&G. He served in this position until his retirement on January 1, 2018. As COO, Mr. Byrne presided over a workforce of approximately 1,900 employees. In addition to his responsibilities with respect to the construction of V.C. Summer Units 2 and 3, Mr. Byrne had responsibility over a multitude of other projects and operations related to power generation and distribution. His responsibilities included overseeing and managing more than 35 coal, gas, nuclear, hydro, biomass, and solar generation plants; overseeing and managing SCANA's high voltage transmission system covering 22,000 square miles; and overseeing and managing coal and uranium procurement, including supply chain development and logistics. During his tenure at SCANA, Mr. Byrne also oversaw a number of successfully completed complex projects, including the construction of a large, combined cycle natural gas plant; the conversion of a coal station to natural gas; the installation of two flue gas scrubbers to limit particulate pollution and other harmful emissions; the decommissioning of a nuclear reactor located adjacent to the VC Summer site; and a backup dam installation project.

In addition to the above projects and responsibilities, Mr. Byrne worked tirelessly over more than a decade on SCANA's efforts to construct two new Westinghouse AP1000 nuclear reactors at V.C. Summer. He first became involved with the Nuclear Project in approximately 2005 when he was the Chief Nuclear Officer for SCANA, and he remained steadfast in his desire to see the Nuclear Project to completion until his retirement in January 2018. Mr. Byrne's commitment to the Nuclear Project is evidenced by the fact that he turned down a job offer in June 2016—the same period during which he joined the charged conspiracy—to become the CEO of Bruce Power, a Canadian utility company based in Ontario, Canada. The position offered to Mr. Byrne was lucrative and would have paid him approximately double the amount of the

compensation he was receiving at SCANA.  Mr. Byrne considered the offer but ultimately decided

to turn down the position because he felt loyal to SCANA and the V.C. Summer project, which he

wanted to see through to completion. [2]

### C.    Nuclear Industry Service

Mr. Byrne has volunteered his time to numerous boards, committees, and worthy causes in

the nuclear industry throughout his 34-year career.  Mr. Byrne's service to the nuclear industry

includes the following:

- Mr. Byrne served on the University of South Carolina Nuclear Engineering Advisory Board from its inception until he retired.  The purpose of this Board was to advise on curriculum, raise scholarship money for nuclear engineering, and recruit prospective students.

- Mr. Byrne served on the University of South Carolina College of Engineering & Computing Dean's Advisory Board (and its predecessor Board) for approximately seven years.

- Mr. Byrne served as co-chair of the nuclear cluster for the Greater Columbia Chamber of Commerce.

- Mr. Byrne was nominated by the South Carolina Governor and confirmed by the South Carolina Senate to serve on the South Carolina Governor's Nuclear Advisory Council.  Mr. Byrne served for 16 years on this Council.  *See* Exhibit B (September 18, 2017 letter from Governor McMaster thanking Mr. Byrne for his "sixteen years of dedicated service.").  The Nuclear Advisory Council advised the Governor on issues relating to nuclear activities in South Carolina.

- Mr. Byrne served on the National Academy for Nuclear Training Accrediting Board.  This Board accredits nuclear training programs throughout the United States.

- From 2000 until January 2018, Mr. Byrne served as President of the Carolinas Virginia Nuclear Power Associates, Inc. Decommissioning Project.  This entity was responsible for decommissioning the Parr Reactor Project, which operated until 1967.

---

[2] Mr. Byrne also turned down a lucrative job opportunity with X-Energy in 2014 which would have offered significant compensation including partial ownership of the company.  Once again, he elected to stay at SCANA because of his dedication to the Nuclear Project and his loyalty to the company.

- Mr. Byrne served on the Nuclear Energy Institute ("NEI") Board of Directors, the NEI's New Plant Oversight Committee (which he chaired), and a predecessor New Plant Working Group from 2007 until 2018. The NEI is a nuclear energy trade association with hundreds of members across the United States.

### D.    Community and Charitable Service

Outside of the nuclear industry, Mr. Byrne has also volunteered his time to numerous community and charitable activities over the years. For example, Mr. Byrne has volunteered substantial time and has provided generous financial support to the United Way of the Midlands for more than 22 years. His service to the United Way of the Midlands includes Campaign Chair for Fairfield County; member of the Board of Directors; Chairman of the Food, Safety, Security and Transportation Community Care Council; Member of the Audit Committee; service on the Alexis De Tocqueville Committee (this Committee recruits members into the giving level of $10,000+ per year); and substantial personal United Way financial donations over the past 22 years, including donating more than $10,000 per year on multiple occasions. *See*, *e.g.*, Exhibit C (Sept. 20, 2016 letter from United Way thanking Mr. Byrne for his pledge of $11,040.00).

In addition to the United Way, Mr. Byrne has volunteered his time to numerous other community and charitable organizations over the years, including serving as Chairman of the Fairfield County Chamber of Commerce and the Greater Columbia Chamber of Commerce; serving as Chairman of SCANA's American Heart Association annual campaign; and serving as Chair of the Fairfield Behavioral Health Services ("FBHS") capital campaign.[3] Mr. Byrne served as a coach for his son's soccer team for a number of years, was a volunteer timekeeper at swim meets in which his son and daughter competed, and he supported the Irish Children's Summer

---

[3] FBHS is a non-profit entity that assists individuals with drug and alcohol dependency issues in rural Fairfield County.

Program, both financially and by hosting Irish children in his home during summers.[4]  Mr. Byrne and his family have also been active parishioners at Our Lady of the Hills and Our Lady of the Lake Catholic Churches, and they have given substantial time and money over the years to support worthy causes through these churches.

In recent years, Mr. Byrne has volunteered his time to Habitat for Humanity building houses for less fortunate families.  As noted by the attached character letter of Louis Kines, Mr. Byrne is considered one of Habitat for Humanity's "regulars" and "has been an asset to our mission and one of our most dependable volunteers."  *See* Letter of Louis Kines (Exhibit A).  In order to improve his skills at Habitat for Humanity, Mr. Byrne has gone so far as to recently attend electrician certification classes at Trident Technical College (where he finished on the Dean's List).

### E.    Character Letters

Attached as Exhibit A are character letters submitted on behalf of Mr. Byrne.  These letters show that Mr. Byrne is an excellent father; he has worked extremely hard his entire life; he has volunteered time and money to give back to his community and the nuclear industry; and the conduct for which he has pled guilty is inconsistent with the way that Mr. Byrne has lived his life.  Indeed, the character letters show that Mr. Byrne is the type of person who has regularly helped numerous other individuals throughout his life in numerous ways.   A few examples of his generosity that are set forth in more detail in the attached character letters include:  helping to pay his niece's private school tuition so that she could go to a better school and improve her education (*see* letter of Ian Byrne); financially supporting his son's best friend in college at Georgia Tech

---

[4] The primary purpose of the Irish Children's Summer Program is to reduce violence and hatred in Northern Ireland due to religious-based prejudice and segregation, by exposing Irish Catholic and Protestant children to a five-week holiday of safety, peace and love in an ecumenical setting.

after his mother developed cancer and could not help pay for college (*see* letter of Sam Bendziewicz); helping to get his nephew through college by allowing him to live at their house, paying for his college expenses, and mentoring him through college until he earned his degree (*see* letter of Penelope Hawkins); moving his mother from Michigan to South Carolina after she began experiencing dementia and paying for all of her expenses and making sure she lived the final years of her life with good medical care and family support (*see* letter of Chris Byrne); and hosting and paying for a dinner for his employees every year and collecting children's books for the women's shelter in Columbia (*see* letter of Julie Byrne).

## II.    OFFENSE CONDUCT

### A.    The V.C. Summer Nuclear Project

This case arises out of the failed nuclear project at the V.C. Summer Nuclear Station in Jenkinsville, South Carolina.  In 2008, SCANA Corporation and SCE&G embarked on a massive project to build two state-of-the-art (and never-before built) Westinghouse AP1000 nuclear reactors at V.C. Summer.  SCANA and SCE&G partnered with Santee Cooper (collectively, the "Owners") to build the reactors.  The Owners signed an Engineering, Procurement, and Construction contract ("EPC Contract") with Westinghouse and Stone & Webster, Inc. (collectively, the "Consortium"), who were responsible for construction of the two reactors.

From its inception, substantial delays and cost overruns plagued the project.  These delays and cost overruns had multiple causes, including licensing delays, the use of a novel modular construction system, and slower-than-promised construction by Westinghouse and its Consortium partners.  Following several extensions to the Nuclear Project's schedule and increases in the associated cost estimates, in October 2015, the Owners renegotiated the terms of the EPC Contract. Under the new agreement, the Consortium agreed, among other things, to bring in a new company,

Fluor Corporation, as subcontractor to Westinghouse to manage construction, to accept enormous financial incentives and penalties tied to timely completion of the Nuclear Project, and to allow the Owners to invoke a new fixed-price option pursuant to which Westinghouse would have to complete the Project for a sum certain, thereby shifting the risk of further cost increases and schedule delays to Westinghouse. Mr. Byrne was optimistic that these measures would get the Nuclear Project back on track.

Eight months later, in June 2016, Mr. Byrne became aware that efforts to improve the pace and productivity of the project would be insufficient to meet the nuclear production tax credit deadline for at least one of the units.[5] On July 1, 2016, specifically, Mr. Byrne submitted written testimony to the PSC stating: "SCE&G's construction experts have reviewed this schedule and found that its scope and sequencing is logical and reviewed and evaluated all information that is available related to the project and schedule and finds it to be reasonable. It is my opinion that WEC and Fluor have a reasonable construction plan in place to achieve the GSCD ... [A]ll these factors support the conclusion that the construction schedule ... is a reasonable and prudent schedule for completing the units ... [I]t is my considered opinion that [the construction schedule] represents a reasonable and prudent schedule for completing the project as envisioned by the BLRA," and that the costs for the Nuclear Project "are prudent in every respect." Mr. Byrne has admitted those statements misrepresented the truth.

Mr. Byrne deeply regrets the false and misleading statements he made in July 2016 regarding the status of and progress made on the Nuclear Project and the damage those statements have caused to those who were negatively impacted by them, believing as he did that he was

---

[5] The tax credit for both units was worth up to $1.4 billion. If the Nuclear Project was completed prior to January 1, 2021, SCANA would have been eligible for federal production tax credits worth up to $1.4 billion ($700 million per unit).

serving a greater good in trying to bring the Nuclear Project to completion. He accepts full responsibility for his conduct and has demonstrated his contrition by providing substantial assistance to federal and state authorities in their long-running investigations into the V.C. Summer project. *See* Section II.B, *infra*.

### B.    Mr. Byrne Accepts Responsibility and Cooperates

Since August 2019, Mr. Byrne has provided substantial assistance to the United States Attorney's Office, the FBI, the SEC, the South Carolina Attorney General's Office, and SLED in connection with their complex and multi-year investigations of the failed Nuclear Project. Mr. Byrne has met in person or telephonically with federal and state authorities on at least fifteen occasions, including at least eight all-day sessions, over the last three-and-one-half years.

Mr. Byrne was the first individual to come forward and accept responsibility for his conduct in connection with the United States' investigation concerning the V.C. Summer project. Mr. Byrne was uniquely positioned to provide detailed and comprehensive information to advance the Government's investigation: he was a top SCANA executive over the Nuclear Project for more than a decade; he communicated regularly with similarly situated executives at Westinghouse, Santee Cooper, CB&I, and Fluor concerning the Nuclear Project; he was involved in numerous important meetings concerning the Nuclear Project and was copied on numerous important emails; and he took detailed notes at almost every meeting that he attended. Mr. Byrne's cooperation was therefore indispensable in helping the United States understand what took place at the Nuclear Project and the individuals and companies bearing responsibility for the project's collapse.

Mr. Byrne first traveled to Columbia to meet with representatives of the United States Attorney's Office, the FBI, the SEC and the South Carolina Attorney General's Office for two full days on August 12 and 13, 2019. During these interviews, Mr. Byrne provided detailed

background information concerning the Nuclear Project and the roles and relationship of relevant individuals and entities.  He described the hiring of third-party consultant Bechtel; Bechtel's 2015 assessment of the nuclear project; the preparation of the Bechtel Report; and information about the roles and knowledge of other individuals concerning the Bechtel Report, including those responsible for determining that the Bechtel assessment should be conducted under attorney-client privilege and should not be disclosed.

During these meetings, Mr. Byrne accepted full responsibility for his unlawful conduct. Mr. Byrne admitted that by June 2016, based on available project data, he knew that completing Unit 3 by the production tax credit ("PTC") deadline of December 31, 2020, was in jeopardy. Consequently, Mr. Byrne acknowledged that statements he and others (including SCANA) made in the summer of 2016 concerning the project's schedule and the ability to complete the project by the guaranteed substantial completion dates ("GSCDs") were misleading.

Mr. Byrne also discussed the roles and knowledge of former CEO Kevin Marsh and other senior SCANA executives, lawyers, and outside counsel regarding the Bechtel Report, the status of the Nuclear Project (including known problems and difficulties), and statements that were made to the PSC and the public concerning the Nuclear Project in SEC filings and other public disclosures.  Mr. Byrne also provided information about important meetings attended, and statements made, by Westinghouse executives Carl Churchman and Jeffrey Benjamin.

Mr. Byrne met again with representatives from the United States Attorney's Office and the FBI in Columbia in an all-day meeting on October 1, 2019.  Mr. Byrne described in great detail the relationship between the project owners (SCE&G and Santee Cooper) and Westinghouse and CB&I; the lack of progress, project delays, and cost increases stemming from the Consortium's poor performance on the project; and communications and negotiations between the Consortium

and the project owners concerning the project.  Mr. Byrne further acknowledged and explained how significant improvements to the project needed to be made before the Company would meet the GSCDs and deadline to obtain the PTCs.  Mr. Byrne interpreted and explained numerous emails, notes and documents relating to meetings and communications involving the project owners and/or the Consortium.  At this meeting, Mr. Byrne also provided further helpful information relating to Mr. Marsh and Mr. Benjamin.

In November of 2019, Mr. Byrne traveled to Columbia again and spent three consecutive days meeting with representatives of the United States Attorney's Office and FBI, providing additional information to assist with ongoing investigations.  During these three days, Mr. Byrne, *inter alia*, described in detail the status of the project at the time certain public statements were made during earnings calls, in securities filings and in PSC testimony.  Mr. Byrne acknowledged that many statements omitted information relating to the actual status of the project at the time that the statements were made.  Mr. Byrne also explained information contained in various internal documents, emails and notes that established knowledge by Mr. Byrne, Mr. Marsh, Mr. Benjamin and others concerning the state of the project at the time.

During the November 2019 meetings, Mr. Byrne also explained the process involved in drafting his and other SCANA executives' and employees' PSC testimony, earnings call statements and securities filings.  Among other things, Mr. Byrne described the role of the regulatory and disclosure attorneys in determining if, and to the extent, project risks would need to be disclosed.  Mr. Byrne also explained the process by which PSC testimony was vetted in group sessions involving numerous attorneys, executives and employees of SCANA.

Mr. Byrne also provided additional information during the November 2019 meetings regarding Bechtel's third-party evaluation and the Bechtel Report.  Among other things, Mr. Byrne

explained the impacts the Bechtel Report would have had on the financial community, and Mr. Marsh's concerns regarding these impacts.  Mr. Byrne further described the ORS's concerns about the project; the fact that all who were involved in the negotiation of an amendment to the EPC contract on the project in 2015 (including Mr. Marsh) were aware that significant improvements had to occur to achieve the GSCDs; and the role of Fluor in reviewing WEC's schedule.

Mr. Byrne met again with representatives from the United States Attorney's Office and the FBI for two full days in January 2020.  These meetings included, *inter alia*, Mr. Byrne providing information concerning SCANA executives' knowledge concerning problems and issues at the project in the Fall of 2015 when the EPC Amendment was being negotiated; further information about Bechtel and internal discussions and communications among the project owners relating to Bechtel's findings; Mr. Byrne's knowledge concerning the schedule re-baselining that he understood Fluor was working on in 2016; and his and other executives' knowledge concerning the risks of the project not meeting the PTC deadline in 2016.  Mr. Byrne also interpreted emails evidencing the lack of progress being made on the project in 2016; provided information about Mr. Churchman's involvement and statements made by Mr. Churchman regarding alleged progress being made at the project; provided information regarding Mr. Benjamin's involvement and representations by Mr. Benjamin relating to the project's schedule; provided information about securities filings and other public statements that did not disclose all of the project's risks; provided information concerning the decision to abandon the Nuclear Project; and provided information concerning discussions involving SCANA counsel post-abandonment regarding upcoming legislative testimony concerning Bechtel.  Mr. Byrne also explained the process concerning, and his and others' involvement in, SCANA press releases, SCANA's September 2016 "Media Day",

and in the preparation of BLRA quarterly reports and presentations made to rating agencies and the financial community.

On May 8, 2020, Mr. Byrne signed a plea agreement in which he agreed to plead guilty to conspiracy to commit mail and wire fraud in violation of 18 U.S.C. § 371.  Mr. Byrne entered his plea of guilty before the Court on July 23, 2020.

On August 25, 2020, Mr. Byrne traveled to Columbia again to meet with FBI Special Agent Aaron Hawkins.  During this meeting, Special Agent Hawkins reviewed information provided by Mr. Byrne during his interviews in November 2019 and January 2020.  Mr. Byrne confirmed and clarified relevant information provided during his previous interviews.

Mr. Byrne spoke to Special Agent Hawkins several more times, including during teleconferences on August 26, 2020  and February 26, 2021.  Mr. Byrne also met with Special Agent Hawkins in Columbia, South Carolina, on May 25, 2021, and via videoconference on January 6, 2021 and July 26, 2021.  Mr. Byrne met most recently with Special Agent Hawkins and Assistant United States Attorney Winston Holliday in Columbia, South Carolina on September 15, 2022.  During these meetings and conferences, Mr. Byrne provided additional helpful information to the Government relating to its ongoing investigation, including information relevant to the investigation and prosecution of Mr. Benjamin.

Mr. Byrne's assistance to the United States and other agencies has already proven impactful.  The United States Attorney's Office informed Mr. Byrne's counsel that Mr. Byrne's assistance saved as much as twenty years' worth of work considering total manhours needed, the massive size of the investigation, the number of documents and potential witnesses, and all of the agents and Government attorneys involved in investigating the case.

Based on the information and assistance provided by Mr. Byrne, SCANA CEO Kevin Marsh entered a plea of guilty to conspiracy to commit mail fraud and wire fraud in November 2020. *See United States v. Marsh*, Case No. 3:20-cr-727 (D.S.C. 2020). Mr. Marsh was sentenced to 24 months imprisonment on October 7, 2021. In connection with his plea and sentencing, Mr. Marsh forfeited $5,000,000 million to the United States. Mr. Marsh also pled guilty to state court charges of obtaining property by false pretenses, and he was sentenced in South Carolina state court to a two-year concurrent term of imprisonment.

In addition, based in part on the information provided by Mr. Byrne, the SEC filed a civil complaint in the District of South Carolina in February 2020 against Mr. Marsh, Mr. Byrne, SCANA and Dominion Energy. *See SEC v. SCANA Corp., et al.*, Case No. 3:20-cv-882 (D.S.C. 2020). SCANA and Dominion Energy have consented to the entry of Judgment against them, and SCANA has paid a civil penalty in the amount of $25 million in the SEC proceeding.

Also, as a direct result of Mr. Byrne's cooperation, on May 21, 2021, former Westinghouse executive Carl Churchman agreed to plead guilty to one count of making a false statement to the United States in violation of 18 U.S.C. § 1001. *See United States v. Churchman*, Case No. 3:21-cr-278 (D.S.C. 2021). Mr. Churchman admitted to lying to an FBI Special Agent in an interview about the Nuclear Project. *See* Bill of Information, *United States v. Churchman,* Case No. 3:21-cr-278 (D.S.C. 2021), Dkt. No. 1. During his interview, Mr. Churchman denied knowledge and involvement in Westinghouse's decision to report estimated project completion dates of April 2020 and December 2020 to SCANA on February 14, 2017. *Id.* In fact, Mr. Churchman was the individual who actually reported these dates to SCANA on February 14th. This fact was proven by information provided by Mr. Byrne, including detailed notes that Mr. Byrne took on the day of the meeting.

Mr. Byrne's cooperation also led to the August 18, 2021, indictment of former Westinghouse Executive Vice President Jeffrey Benjamin. *See United States v. Benjamin*, 3:21-cr-525 (D.S.C. 2021). Mr. Benjamin was indicted on 16 counts, including wire fraud, securities fraud, conspiracy and causing the failure of a publicly traded company to keep accurate corporate records. Mr. Benjamin's indictment was based in part on Mr. Benjamin's and Westinghouse's failure to provide truthful and accurate information to the project owners regarding Westinghouse's ability to achieve the schedule for Units 2 and 3; Westinghouse's representations that it would provide a fully integrated resource loaded schedule to the project owners (which it never provided); and significant information that was hidden by Westinghouse from the project owners, including information relating to project costs, Westinghouse's ability to complete the project in time to qualify for the PTCs, and its ability to provide a fully integrated resource loaded schedule to the project owners. *See* Indictment, *United States v. Benjamin*, 3:21-cr-525 (D.S.C. 2021), Dkt. No. 2.[6] Through his cooperation, Mr. Byrne provided detailed and helpful information to the United States concerning all of these topics. Mr. Byrne is also committed to testifying at trial against Mr. Benjamin as a Government witness after his sentencing in this matter, in addition to providing additional assistance to the Government as needed.[7]

Finally, Mr. Byrne's cooperation led in part to an August 23, 2021, Cooperation Agreement entered into between Westinghouse and the United States Attorney's Office. *See* Press Release, U.S. Attorney's Office, District of South Carolina, *U.S. Attorney's Office Announces Agreement Securing Westinghouse's Cooperation in the V.C. Summer Criminal Investigation and Payment of $21.25 Million for Low Income Ratepayer Relief* (Aug. 30, 2021), https://www.justice.gov/usao-

---

[6] The United States filed a Superseding Indictment against Mr. Benjamin on February 22, 2023. *See id.* at Dkt. No. 129.

[7] Mr. Benjamin's case is scheduled for trial during this Court's October 2023 term.

sc/pr/us-attorney-s-office-announces-agreement-securing-westinghouse-s-cooperation-vc-summer.  Pursuant to this agreement, Westinghouse agreed to pay $21.25 million and to cooperate in the Government's ongoing investigation.  It is noteworthy that Westinghouse did not enter this agreement until more than two years after Mr. Byrne began his lengthy history of cooperation.

## III.    THE CORRECT INITIAL GUIDELINES CALCULATION IS 70-87 MONTHS

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."  *Gall v. United States*, 552 U.S. 38, 49 (2007).  Mr. Byrne respectfully submits that the correct initial Guidelines calculation for his offense is 70-87 months because Mr. Byrne's adjusted offense level should be 27 and his criminal history category is I.

### A.    Mr. Byrne's Adjusted Offense Level Is 27

Mr. Byrne agrees that his base offense level is 6, as set forth in the Presentence Investigation Report ("PSR").  *See* U.S.S.G. § 2B1.1(a)(2).  He likewise agrees with the PSR's recommendation his base offense level be subject to (1) a 2-level increase under § 2B1.1(b)(2) (more than 10 victims) and (2) a 3-level reduction under § 3E1.1 (acceptance of responsibility).

Mr. Byrne submits that the PSR's Guidelines calculation is incorrect in two critical respects.  First, the PSR represents that Mr. Byrne has been "held accountable for at least $520,000,000.00 in actual loss," PSR ¶¶ 58, 62, and accordingly recommends that the Court apply a 28-level increase under U.S.S.G. § 2B1.1(b)(1)(O).  But the available evidence supports, *at most*, an actual loss figure of $64,428,000 tied to increased utility rates charged by SCANA and authorized by the South Carolina PSC in connection with the Nuclear Project after Mr. Byrne's criminal conduct commenced in June 2016.  Second, the PSR incorrectly recommends that the Court apply a 2-level role enhancement based on U.S.S.G. § 3B1.3, even though an abuse of trust

is necessarily included in the underlying offense, i.e., conspiracy to commit wire or mail fraud. Mr. Byrne submits that his adjusted offense level should be 27, not 35 as set forth in the PSR.

1.     The Court Should Reject the Recommended Loss Amount

Mr. Byrne contends that a 22-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(L) is appropriate based on the evidence of record. The government bears the burden of establishing the loss amount. *United States v. Cavallo*, 790 F.2d 1201, 1232 (11th Cir. 2015). When determining a loss amount in connection with sentencing, courts must make a "reasonable estimate" of the loss amount "given the available information." U.S.S.G. § 2B1.1 cmt. 3(C); *United States v. Binday*, 804 F.3d 558, 595 (2d Cir. 2015); *United States v. Jenkins*, 578 F.3d 745, 749 (8th Cir. 2009). The actual loss amount is defined as the "reasonably foreseeable pecuniary harm that *resulted from the offense*" and must be established by a preponderance of the evidence. U.S.S.G. § 2B1.1 cmt. 3(A)(i) (emphasis added); *Binday*, 804 F.3d at 68; *United States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004) ("[T]he Sentencing Guidelines import the legal concept of a causal relationship between the defendant's conduct and the determined loss.").

Here, the PSR's finding that Mr. Byrne has been "held accountable for at least $520,000,000.00 in actual loss" to SCANA's 700,000 customers, PSR ¶ 58, appears to be based on a single, inapposite allegation in the Bill of Information (ECF 1) that reads: "[F]rom its first petition in 2009 and throughout the construction of the Nuclear Project, SCANA documents show that it paid over $2.5 billion in dividends to its investors, more than $520 million of which came directly from SCANA customers through rate increases under the BLRA," *id.* ¶ 27 (quoting Bill of Information ¶ 26).[8] Mr. Byrne respectfully submits that the use of that sole allegation in the

---

[8] While the PSR cites to Paragraphs 47, 48, 53-57, and 59 in support of the $520 million loss amount, none of those paragraphs even reference the loss amount identified by the Probation Office. The sole support for that figure is provided in Paragraph 27 of the PSR.

Bill of Information as the basis for calculating the actual loss amount in this case is incorrect for two reasons.

First, the PSR acknowledges that its $520 million loss amount represents purported payments to SCANA shareholders derived from BLRA rate increases over a ten-year period, from 2009 to 2018. But, according to the U.S. Attorney's Office's own allegations, Mr. Byrne's criminal involvement in the scheme spanned, at most, the period "beginning in June 2016 and continuing until January 1, 2018." *See* Bill of Information ¶ 29. And Kevin Marsh, the only other SCANA executive to have been charged with joining the same criminal conspiracy as Mr. Byrne, is alleged to have begun his criminal activity "no later than late 2016, and continuing until January 1, 2018." Bill of Information, *United States v. Kevin Marsh*, No. 3:20-CR-00727-MGL (Nov. 24, 2020), Dkt. No. 1. Accordingly, any loss associated with utility rate increases approved *prior to* June 2016, the earliest *any* charging instrument alleges the conspiracy to have begun, cannot be causally connected to any misleading statement(s) made by Mr. Byrne or one of his co-conspirators based on the available evidence. Put differently, rate increases implemented between the beginning of the Nuclear Project in 2009 through May 2016 could not have "resulted from the offense" in June 2016 and should not be included in the loss amount attributed to Mr. Byrne's conduct.

Second, even for increased rate payments made by SCANA's customers after Mr. Byrne joined the conspiracy in June 2016, the PSR cites no evidence to support a determination by the Court that those amounts actually "resulted from the offense," much less Mr. Byrne's involvement in such offense.

In answering these same objections, the Probation Office has stood by its full $520 million loss amount on the grounds that Mr. Byrne's "continued misrepresentations are what ultimately

led to the nuclear reactor project becoming financially unviable and its ultimate failure." Addendum to PSR at 6-7.  After acknowledging that only a portion of the full loss amount was paid by SCANA's customers prior to Mr. Byrne "engaging in a conspiracy to defraud," the Probation Office alleges that "those funds were meant to pay for the nuclear reactors" and that "[t]he failure of the project, and accordingly, the loss of the rate-hike funds paid prior to June 2016 are attributable to the defendant and his coconspirators' misrepresentations and false statements between June 2016 and January 2018." *Id.* at 7-8.  There simply is no basis for that conclusion in the record.  The Government does not allege in this case, or in any other case arising from the Nuclear Project, that the conspiracy among SCANA executives to commit wire or mail fraud beginning in June 2016 *caused* the Nuclear Project to fail.  Instead, as the Bill of Information makes clear, by June 2016, the Nuclear Project was already woefully behind schedule and unlikely to meet important tax credit deadlines on at least one of the units.  Mr. Byrne's misstatements beginning in June 2016 obscured the true state of the Nuclear Project from regulators and the public for a period of months.  They did not *cause* the Nuclear Project to fail.  That failure lies at the feet of Westinghouse and the Westinghouse executives who have been or are being prosecuted by the United States Attorneys' Office.  Indeed, had Westinghouse not filed for bankruptcy protection and refused to comply with its obligations under the EPC Amendment, Westinghouse would have been responsible for all cost overruns on the project (and the project would have moved forward, as shown by the progress of the Vogtle project in Georgia).[9]  With Westinghouse on the hook for all cost overruns and schedule delays, there would have been no reason for the project owners to have abandoned the Nuclear Project.

---

[9] The Vogtle project was being constructed by Westinghouse in Waynesboro, Georgia at the same time as the V.C. Summer project.  Similar delays and cost overruns were experienced at the Vogtle project, but the owners of that project did not elect to abandon construction.

Mr. Byrne instead submits that the actual loss that "resulted from the offense" should include rate increases that were approved by the South Carolina PSC and paid by SCANA customers *after* his criminal conduct commenced in June 2016. There was only one such rate increase. In May 2016, SCANA submitted its ninth and final rate increase request to the PSC. On October 26, 2016, the PSC approved the requested rate increase and authorized SCANA to charge an additional $64,428,000 in capital cost for the Nuclear Project to its customers in the form of increased rates under the BLRA. *See Order Granting Request for Approval of Revised Rates*, PSC Docket No. 2016-224-E (Oct. 26, 2016).[10] At most, Mr. Byrne can be held accountable for only the portion of that $64.4 million that was ultimately paid by consumers and that resulted from the charged offense.

Using the entire $64.4 million figure as the actual loss amount for purposes of the Guidelines calculation would increase Mr. Byrne's adjusted offense level by 22 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(L).

2.    The Court Should Not Apply the Recommended Role Enhancement

In addition, the PSR recommends a 2-level role enhancement under § 3B1.3. As relevant here, a court may impose this enhancement only if "the defendant abused a position of public or private trust, ... in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. However, the Guidelines provide this enhancement may *not* be applied "if an abuse of trust or skill is included in the base offense level or specific offense characteristic." *Id.*; *see also United States v. Jolly*, 102 F.3d 46, 49 (2d Cir. 1996) ("Section 3B1.1 precludes an enhancement where the abuse of trust is included in the specific offense characteristic"). As reflected in Paragraph 89 of the PSR, fraud—the offense characteristic—is

---

[10] https://dms.psc.sc.gov/Attachments/Order/6e95b4ac-571b-4097-a376-dc18fcd131e4.

already reflected in Mr. Byrne's base offense level.  Indeed, courts have cautioned against applying this 2-level enhancement in fraud cases involving corporate officers because there is often "a component of misplaced trust inherent in the concept of fraud." *United States v. Mullens*, 65 F.3d 1560, 1567 (11th Cir. 1995) (vacating abuse of trust enhancement for CEO who pled guilty to orchestrating Ponzi scheme); *see also Jolly*, 102 F.3d at 49 (vacating abuse of trust enhancement for corporate president who procured financing through fraud); *United States v. Williams*, 527 F.3d 1235, 1250 (11th Cir. 2008) (vacating abuse of trust enhancement for executive director convicted of theft of federal funds and wire fraud); *United States v. Broderson*, 67 F.3d 452, 456 (2d Cir. 1995) (vacating abuse of trust enhancement for divisional VP who provided inaccurate cost estimates in violation of federal statute).  The same logic should apply here.  Because the underlying offense to which Mr. Byrne pled guilty incorporates an abuse of trust, the Court should decline to impose the additional, cumulative 2-level enhancement under § 3B1.3.

Mr. Byrne's total adjusted offense level accordingly is 27.

**B.    Mr. Byrne's Criminal History Category is I**

Mr. Byrne's criminal history category is I because he has no criminal record.[11]

\*        \*        \*

To summarize the above calculations:

| | |
|---|---|
| Base Offense Level, § 2X1.1, 2B1.1(a)(2) | 6 |
| Amount of Loss, § 2B1.1(b)(1)(L) | +22 |
| More Than 10 Victims, § 2B1.1(b)(2)(A)(i) | +2 |
| Acceptance of Responsibility, § 3E.1(a) & (b) | -3 |
| **Total Offense Level:** | **27** |

---

[11] PSR ¶ 83.

| | |
|---|---|
| **Criminal History Category:** | **I** |
| **Guideline Range:** | **70-87 Months** |
| **Maximum Statutory Sentence, 18 U.S.C. § 371:** | **60 Months** |
| **Guidelines Sentence (per U.S.S.G. § 5G1.1(a)):** | **60 Months** |

## IV.   A DOWNWARD VARIANCE FROM THE GUIDELINES RANGE TO FIFTEEN MONTHS MEETS THE REQUIREMENTS OF 18 U.S.C. § 3553(a)

After calculating the applicable guidelines range, "the district judge should then consider all of the § 3553 factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50.  The court "must make an individualized assessment based on the facts presented," *id.*, and impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of [§ 3553(a)]," 18 U.S.C. § 3553(a).  Further, by enacting 18 U.S.C. § 3582, Congress explicitly recognized that imprisonment is "not an appropriate means of promoting correction and rehabilitation."

When considering a variance to the United States Sentencing Guidelines, the Fourth Circuit mandates that a sentencing court consider each of the factors listed in 18 U.S.C. § 3553(a).  *See United States v. Pauley*, 511 F.3d 468, 473-75 (4th Cir. 2007).  These factors include the following: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense; to provide just punishment and adequate deterrence; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment; (3) the kinds of sentences available; (4) the sentencing range established by the United States Sentencing Guidelines; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among

defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).[12]

It is respectfully submitted that a downward variance to fifteen months, below the Guidelines sentence of 60 months, meets the requirements of Section 3553(a) for the reasons set forth below.

### A.    Factor One: The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant Support the Requested Sentence

#### 1.    History and Characteristics of Mr. Byrne

Mr. Byrne has no prior history of engaging in unlawful conduct, and the offense at issue is completely inconsistent with Mr. Byrne's numerous accomplishments and good deeds over the past 63 years of his life.  As discussed, Mr. Byrne has worked extremely hard his entire life, starting as a paperboy at age 12, and working multiple jobs while in high school, including at two restaurants, a car repair facility, clothing store, and his city's Recreation Department.

Mr. Byrne graduated in the top ten in his high school class of more than 600 students. Following high school, Mr. Byrne attended college on an academic scholarship, while playing collegiate soccer, working part-time in a local drug store, a local K-mart, and refereeing soccer to help pay for expenses that his scholarship did not cover.  During the summer, Mr. Byrne worked for the Army Corps of Engineers and took night classes while in college.  After he earned his degree in chemical engineering, Mr. Byrne worked successfully for Centerior Energy for more than a decade, where he was promoted on multiple occasions, and ultimately became the

---

[12] Mr. Byrne does not presume to explain to the Court the kinds of sentences available in this case, nor is he aware of any policy statement issued by the Sentencing Commission that would be relevant.  He addresses the Guidelines calculation above, *see supra* Part III.

Operations Manager of the Davis-Besse Nuclear Power Station. Mr. Byrne earned his Federal Senior Reactor Operators License from the NRC at the age of 27.

Mr. Byrne joined SCANA in 1995 and worked for the company for more than 22 years. Once again, his hard work led to multiple promotions, including the role of Chief Operating Officer and Senior Vice President. He served in that position for approximately seven years, where his responsibilities went far beyond overseeing the complex new Nuclear Project. Indeed, Mr. Byrne had responsibility for more than 35 coal, gas, nuclear and other plants and the transmission system as COO of SCE&G, and he successfully spearheaded the completion of a number of large projects undertaken by SCANA.

For more than three decades, Mr. Byrne has a dedicated track record of giving back to the nuclear industry and his community. In the nuclear industry, Mr. Byrne volunteered his time to numerous worthy causes and organizations, including the University of South Carolina Nuclear Engineering Advisory Board and College of Engineering & Computing Dean's Advisory Board, the South Carolina Governor's Nuclear Advisory Council, the National Academy for Nuclear Training Accrediting Board, the Nuclear Energy Institute, and the Carolinas Virginia Nuclear Power Associates Decommissioning Project. Similarly, outside of the nuclear industry, Mr. Byrne has donated time and money to numerous community and charitable organizations, including the United Way of the Midlands, Fairfield Behavioral Health Services, the Fairfield County Chamber of Commerce, the Greater Columbia Chamber of Commerce, and the American Heart Association. He also served as a youth soccer coach for many years (including for teams on which his children played and other youth teams), was a volunteer timekeeper at swim meets in which his son and daughter competed, supported the Irish Children's Summer Program (financially and by hosting), and donated substantial time and money over the years to Our Lady of the Hills and Our Lady of

the Lake Catholic Churches.  In addition, over the last two years, Mr. Byrne has volunteered and continues to volunteer his time on a regular basis to Habitat for Humanity.

The character letters that have been submitted show that Mr. Byrne is an excellent father who was instrumental in the raising of his daughter and son.  Both of his children have gone on to be extremely successful, including his son's service as a Green Beret and member of the U.S. Army's elite Special Forces.  The character letters also show that Mr. Byrne has repeatedly invested in family members and others in need throughout his life.

2.    <u>Nature and Characteristics of the Offense</u>

The offense to which Mr. Byrne has pled guilty is a serious offense.  However, Mr. Byrne's involvement in the conspiracy was for a short period of time and he did not attempt to profit from the venture in any manner, including by selling SCANA stock.  Indeed, rather than being motivated by profit or greed, Mr. Byrne's motivation at all times was to see the V.C. Summer new Nuclear Project through to completion, a goal he had been working toward for more than a decade.  This is demonstrated by the fact that Mr. Byrne had two separate opportunities to leave SCANA and go to work for other utilities at approximately double the pay, but he turned down each opportunity due to his desire to complete the Nuclear Project.

It is also important to note that the Nuclear Project was an extremely complex project. Prior to the V.C. Summer and Vogtle projects, no new nuclear project had been successfully started and completed in the United States in decades.  Moreover, the AP1000 technology used by Westinghouse on the V.C. Summer project was a brand-new technology.  No AP1000 units had ever been constructed in the United States.

In addition to the complexity of the project and the first of its kind technology, the problems on the V.C. Summer project stemmed mainly from poor construction performance and schedule

adherence by Westinghouse and its partners in the Consortium.  Moreover, Westinghouse was not

forthcoming and transparent with the project owners, as they continued to represent to Mr. Byrne

and others that the project could, in fact, be completed prior to the PTC deadline (and, as part of

the EPC Amendment in October 2015, Westinghouse agreed to liquidated damages and incentive

payments totaling approximately $1 billion which were tied to completing the nuclear project

before the PTC deadline[13]).  *See*, *e.g.*, Bill of Information, *United States v. Benjamin*, 3:21-cr-525,

Dkt. No. 2 at Para. 61 ("Benjamin, and others, through Westinghouse, made materially false and

misleading statements in an effort to continue the Project by minimizing the Project's failures.

Among other things, false and misleading statements were made to the Owners [which included]

Represent[ing] to the Owners that Unit 2 would be completed and operational at various dates and

would qualify for the PTCs[;] … Represent[ing] to the Owners that Unit 3 would be completed

and operational to qualify for the PTCs[;] … Represent[ing] to the Owners that Units 2 and 3

would be in operation in 2019 and 2020[;] … Represent[ing] to the Owners on September 26,

2016, that Westinghouse had no information that the substantial completion dates of June 2019

(Unit 2) and June 2020 (Unit 3) would not be met[; and] … Represent[ing] to the Owners on

September 26, 2016 that a fully resource-loaded integrated schedule was being prepared, when in

truth Westinghouse had ordered Fluor to stop work on determining a project schedule.").  Further,

had Westinghouse not escaped the provisions of the EPC Amendment by filing for bankruptcy,

the project would have moved forward, and Westinghouse (not SCANA ratepayers) would have

been generally responsible for project-related cost overruns.

### B.     Factor Two: A Sentence of Fifteen Months Would Honor the Sentencing Goals Described in 18 U.S.C. § 3553(a)(2)

---

[13] In essence, Westinghouse bet its future on completing the V.C. Summer project on time.

1.    <u>Promoting Respect for the Law and Providing Just Punishment for the Offense</u>

A sentence of no more than fifteen months provides just punishment.  The offense Mr. Byrne has pled guilty to is a serious offense, and the proposed sentence is commensurate with his conduct and role in the conspiracy, especially in light of Mr. Byrne's extraordinary cooperation. Mr. Byrne has learned a harsh lesson from this investigation and prosecution, which have rendered him effectively unemployable in the nuclear industry, placed great stress on his marriage, and ruined countless professional and personal relationships he has built over the course of his life.  It also reflects Mr. Byrne's acceptance of responsibility, which he has demonstrated by being the first co-conspirator to plead guilty to his role in the offense and by providing substantial cooperation to the Government in its investigations and prosecutions of his co-conspirators and others.

The requested sentence also promotes respect for the law.  It signals to others the necessity of being forthright and transparent with the public, media, and regulators when engaging in public works projects, especially when such projects involve the use of public funds.  Further, Mr. Byrne not only faces a potential term of imprisonment, but he also has agreed with the Government to forfeit $1,000,000, in addition to any criminal fines that may be assessed, notwithstanding the fact that his reasons for participating in the charged conspiracy were not personal enrichment.

Mr. Byrne has and will continue to suffer significant collateral consequences as a result of his conviction which are relevant to the Court's sentence.  Offers of employment previously extended to Mr. Byrne post retirement have been revoked.  Indeed, regardless of the length of his sentence, Mr. Byrne's respected professional career in the nuclear industry is over, and his ability to support himself going forward is irreversibly and drastically diminished.  Beyond these severe consequences, Mr. Byrne's reputation is ruined in his community and more broadly.  As the Court

is no doubt aware, this case has been covered in the media on a regular basis since the nuclear

units were abandoned in July 2017, more than five and one-half years ago. Mr. Byrne's name has

repeatedly appeared in a negative light in newspaper articles, television reports, and other media

coverage. The *Post and Courier* and *The State* newspapers have covered this case such that any

search of Mr. Byrne's name leads inevitably to lengthy descriptions of the charge against him.

Even after he completes any sentence, Mr. Byrne will never be able to shed the indelible mark left

by his felony conviction. In short, he is a convicted felon, and his reputation is ruined. For an

individual who is as driven and hard working as Mr. Byrne, these are devastating consequences.

Mr. Byrne has also been sued civilly by the SEC and has had to defend against numerous

class action lawsuits over the last six years, including multiple derivative lawsuits, a class action

federal securities lawsuit, and a federal RICO lawsuit.

Mr. Byrne has also been subject to significant restrictions in his travel over the last twenty

months while out on bond and cooperating with the United States.

These severe collateral consequences are all relevant to the Court's sentence.

2.      Affording Adequate Deterrence to Criminal Conduct and Protecting the
        Public from Further Crimes by the Defendant

A sentence of not more than fifteen months would also serve the goals of adequate

deterrence. Mr. Byrne poses no risk of recidivism. He is 63 years of age, has no prior criminal

history, and outside of the short period of time at issue in this case, he has lived an exemplary life.

Further, as a result of his guilty plea in this case, Mr. Byrne is virtually unemployable and there is

no reasonable prospect he would ever be entrusted again as an officer of a public company, even

if he is not expressly barred from such position.

As noted, Mr. Byrne has been deeply impacted by the many devastating consequences he

already has experienced as the result of his conviction. Following sentencing in this matter, Mr.

Byrne will be a convicted felon. His career and reputation in the nuclear industry have been destroyed. He has lost his job and is virtually unemployable. He has agreed to forfeit $1,000,000 dollars from his own pocket, and additionally has had to defend himself in numerous civil class action lawsuits relating to this matter. In short, Mr. Byrne has already suffered greatly for his conduct and general deterrence is served by the proposed sentence. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (holding that the sentencing court properly considered that the "conviction itself already visit[ed] substantial punishment" on the defendant by likely barring him from future work in his chosen profession); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (granting departure where defendant was already punished by the loss of his business as a result of his conviction); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (holding that the sentencing court properly considered the defendant's "atypical punishment such as the loss of his reputation and his company [and] the ongoing case against him from the Securities and Exchange Commission"); *United States v. Roth*, 2008 U.S. Dist. LEXIS 19603, at *2-3 (N.D. Ill. Mar. 11, 2008) (imposing a sentence of probation in part because "[t]he publicity regarding her conduct ha[d] obviously caused her great embarrassment and humiliation").

       3.     <u>Providing Educational or Vocational Training, Medical Care, or Other Correctional Treatment</u>

These factors are not pertinent in the sentencing of Mr. Byrne. He is a college graduate and has a degree in chemical engineering and is in good physical health.

**C.    Factor 6: The Need to Avoid Unwarranted Sentencing Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct**

As of the present date, only one other defendant has been sentenced in this matter: former SCANA CEO Kevin Marsh. Mr. Marsh did not come forward to plead guilty and cooperate with the United States until November 2020, more than one year after Mr. Byrne's cooperation began,

and approximately five months after Mr. Byrne signed his plea agreement in this case.  Mr. Marsh was sentenced by this Court to a term of imprisonment of 24 months.

Mr. Byrne was the first individual to come forward and accept responsibility for his conduct and involvement in the same conspiracy as Mr. Marsh.  Indeed, it was Mr. Byrne's early and substantial cooperation in the Government's investigation of Mr. Marsh and other SCANA executives that led to Mr. Marsh's guilty plea.  Mr. Byrne respectfully submits that any term of imprisonment imposed by this Court should be substantially less than the twenty-four months that Mr. Marsh received, and, indeed, less than any other defendants' sentences related to the V.C. Summer project.  A term of imprisonment of fifteen months would avoid an unwarranted and unjust sentencing disparity between Messrs. Byrne and Marsh.

**D.    Factor 7: The Need to Provide Restitution to Any Victims of the Offense**

The parties to this case have agreed that there are two categories of victims:  SCANA customers and SCANA shareholders.

With regard to customers, Mr. Byrne and the Government agreed that any restitution amount as related to customers should be offset by the approximately $4,000,000,000 of ratepayer remedial value paid by Dominion and agreed to pursuant to the Executed Cooperation Agreement, dated December 27, 2018.  *See* Plea Agreement Paragraph Two, Section C; PSR ¶¶ 38, 64.

With regard to shareholders, the parties agreed pursuant to 18 U.S.C. § 3663A(c)(3), (A) that, due to the large number of identifiable investors and (B) the complex issues of fact related to the amount of investors' losses, if any, that would complicate or prolong the sentencing process – including: timing when shares were purchased and sold, the SEC civil enforcement action, the shareholders' state and federal law suit(s), the dividends paid to the shareholders during the time of the conspiracy, and the premium paid to the shareholders upon Dominion's acquisition of

SCANA – the need to provide restitution to victims, if any, is outweighed by the burden on the sentencing process and the Mandatory Restitution Act should not apply as related to shareholders' losses, if any.  *See* Plea Agreement Paragraph Two, Section C; PSR ¶¶ 38, 65.  The PSR does not reach a contrary recommendation.  *See* PSR ¶ 65.

Mr. Byrne respectfully submits that the Court should impose no restitution order in this case consistent with the recommendation of the Probation Office.

### E.    Cooperation

Finally, Mr. Byrne requests that the Court consider his substantial and impactful cooperation in considering a variance from the Guidelines.  *See United States v. Terry*, 771 F. App'x 277, 278 (4th Cir. 2019) (court may consider "cooperation in the course of applying 3353(a) factors even in the absence of a … [motion pursuant to 18 USC § 3353(e)]").  Mr. Byrne has been actively cooperating with federal and state authorities since August 2019.  He has already provided substantial assistance in multiple investigations: (1) the criminal investigation by the FBI and United States Attorney's Office in the District of South Carolina which has resulted in a federal plea of guilty and the conviction of former SCANA CEO Kevin Marsh; the plea of guilty entered by former Westinghouse executive Carl Churchman; the 16-count Indictment against former Westinghouse Senior Vice President Jeffrey Benjamin; and the cooperation agreement entered into by Westinghouse pursuant to which it agreed to cooperate with the United States and pay $21.25 million; (2) the SEC's securities investigation which culminated in a civil complaint filed in February 2020 against Mr. Marsh, Mr. Byrne, SCANA, and Dominion Energy, and a $25 million civil penalty by SCANA; and (3) the investigation conducted by the South Carolina Attorney General's Office and SLED which resulted in a plea of guilty and conviction by Mr. Marsh to the charge of Obtaining Property by False Pretenses, in violation of S.C. Code § 16-13-240(1).  As set

forth in more detail *supra*, Mr. Byrne's three and one-half years of cooperation has included numerous debriefings by federal and state agents and attorneys, the interpretation of numerous emails and documents, and information explaining the roles and culpability of himself and others. Mr. Byrne was the first defendant to accept responsibility in this extremely large and complex prosecution, and his cooperation has been indispensable to the United States in prosecuting others and in understanding what led to the decision to abandon the nuclear units at V.C. Summer.

## V. CONCLUSION

Here, there is no compelling need, based on the facts of this case, to sentence Mr. Byrne to a prolonged period of incarceration. In view of his contrition, acceptance of responsibility, and substantial cooperation to the Government, among the other factors discussed above, Mr. Byrne respectfully submits that a significant downward variance from the Guideline sentence—to a term of imprisonment of no more than fifteen months—is warranted and consistent with the sentencing principles outlined in 18 U.S.C. § 3553(a).

Respectfully Submitted,

By:    *s/ Margaret N. Fox*
James M. Griffin, Fed. ID 1053
Margaret N. Fox, Fed. ID 10576
GRIFFIN | DAVIS
4408 Forest Drive, Suite 300
Columbia, SC 29607
(803) 744-0800
jgriffin@griffindavislaw.com
mfox@griffindavislaw.com

*Attorneys for Mr. Stephen A. Byrne*

March 5, 2023
Columbia, South Carolina